This case involves what we believe a misapplication of the law. We believe that the Commission's reversal of the arbitrator's decision was erroneously based on the existence of a pre-existing condition. And how we know that is two ways. We know in the award for permanency, the pre-existing condition was specifically referenced as the reason for the reduction in the award. Also, the decision, the first paragraph is entitled pre-existing condition, as though it's the findings of fact. And then beyond that are the specific conclusions with respect to medical temporary total disability and permanency. And so our position is that that essentially tainted the entire decision. We believe that the decision, since it otherwise runs counter to the manifest way to the evidence, that it was rendered with this idea that there's a pre-existing condition and we have to lighten the decision somewhat. And that's why they reduced the TTD, they reduced the medical, they took away the award, $75,000 award of medical, and then reduced the permanency from 22.5% loss of use of man as a whole to 10%. Didn't the Commission ostensibly do that based on the opinions of Dr. Werner, Dr. Graf, and Dr. Trotter? They testified they found no objective support for the claimant's ongoing lumbar complaints, did not detect any change in the post-accident MRI scan from the pre-accident MRI scan. So didn't they hang their head on the testimony of the doctors? Well, certainly not in the reduction of permanency. Because truly if they believed that this was, as Dr. Weiner said, a temporary aggravation and the worker went back to baseline following this artificial date of October 5th, 2009, then there should have been no permanency award whatsoever. That's the consistent award. Rather, they did award permanency. They don't even believe it was just simply a temporary aggravation. They understand it was a permanent aggravation. The successive treatment thereafter and the successive temporary disability thereafter runs counter to Dr. Weiner's opinion that October 5th, 2009 was this significant MMI date. The two other doctors mirror what Dr. Weiner said. So I believe that just because three doctors all say the same thing, really it's Dr. – they're not adding anything new to Dr. Weiner's opinion that this was a magical date where MMI was reached. It turned out not to be true. It turned out to be against the manifest weight of the evidence. This is strictly a manifest weight case, isn't it? Your Honor, I believe that the misapplication of law was erroneous as a matter of law. Well, we see a lot of appellants in manifest weight cases creatively try to turn it into de novo review. This morning we had a repetitive trial where there was a claim of requiring quantitative evidence. Who was that? And now this afternoon we have a claim that they're apportioning the preexisting condition. Your Honor, if I may, let me distinguish. In this case, there is no question. In that case, I was arguing that it must be inferred that – I'm not asking you to give up anything here. Okay. Here's the difference in this case, though. In this case, they told us why they reduced the award. They made it clear. It's because of the preexisting condition that we feel it's not 22.5 percent loss of use of the man, it's 10 percent. That doesn't mean they apportioned between this injury and the preexisting condition, though. I mean, can it be as easily gleaned from the evidence that they simply determined what he was entitled to based upon a short-term aggravation? It's not as though they didn't tell us. It's not as though we look at other portions of the decision. They specifically reference – they don't reference – They didn't say, though, we're going to divide this between his preexisting condition and – No, but that's the Fitts case. They didn't do that in the Fitts case either. In the Fitts case, what they did was exactly what they did here. I even believe it was 22 percent – 22.5 percent loss of use of the man as a whole. They didn't apportion. They didn't say 12.5 here and 10 here. But what they said is we're going to reduce it because some aspect of this injury is non-work-related and some aspect is. It's once causation has been determined, once it's been determined that the accident otherwise aggravated the preexisting condition, the fact that a preexisting condition existed is irrelevant for the award of permanency. And so while in our brief we argue that the decision runs counter to the manifest weight, that being the petitioner was off from – for a period of time, went back to baseline, and then resumed treatment, he kept treating. He kept treating until the next year when he was released by his own treating doctor. Her opinion, as far as I'm concerned, is stale by that point and runs counter to what actually occurred. Her prediction of what should be occurring here was rendered wrong. And – When you say continue to receive treatment, doctors, Warner, Graff, and Trotter found the claimant reached MMI on the work-related injury that caused an aggravation of his preexisting degenerative spine condition on October 5, 2009, and that he required no additional treatment or diagnostic testing after that date. That was their testimony. Right. So where is this continuing problem after that date? Well, if you were to believe Aramark's doctor, it's because of the childhood meningitis that apparently appeared on the day after October 5, 2009, which is – it runs counter to logic and it runs counter to the manifest way to the evidence. There was successive disability. There were successive pain complaints. The pain complaints didn't cease on October 6, 2009. They continued. And I understand that the Section 12 examiners would like to ignore that and somehow explain it and point the finger at something else, but there's nothing to point the finger at other than, I suppose, the childhood meningitis, which is – even the Commission didn't pick up on that. So we believe that this notion that the Commission used the wrong legal standard, focused on the preexisting condition in rendering this decision, is especially apparent when you look at that the only reason they denied benefits here, the only reason was Dr. Wiener's report and the following reports that mirror Dr. Wiener. There's nothing else. Like I said, they didn't pick up on the meningitis. They don't believe that that's what now accounts for the current condition. For that reason, if there's no other questions, we would respectfully request that the arbitrator's decision be reinstated or otherwise the case be remanded for further proceedings with the Commission. Thank you, Counsel. Counsel, you may respond. Good afternoon. Terry Donohue on behalf of the Defendant Aramark. Counsel. May it please the Court. The Defendant here respectfully submits that the award of PPD benefits is not erroneous as a matter of law and that the Commission did not apply the wrong legal standard. The first thing I'd like to address is we submit that the plaintiff actually waived any issue of law argument which is based upon improper apportionment. This is being raised for the first time now here in the appellate court. It was not raised in the circuit court. My understanding is that a new argument raised for the first time, which directly conflicts with the legal theory presented below, should not even be considered. In its circuit court brief, the plaintiff wrote, quote, the plaintiff agrees that the award of 10% loss of use of the person as a whole was inadequate given the diagnostic findings, period of temporary total disability, and extent of medical treatment. So the plaintiff actually argued several months ago in favor of this 10% PPD award, reasoning that because the claimant, in fact, sustained a PPD award as high as 10%, that the other issues, the medical bills and the TTD awarded, should be commensurately raised to be equivalent to that 10%, which was suggested to be substantial. They didn't argue at the time that 10% was any type of additional amount for an aggravation on top of a preexisting amount, only that the 10% is the full extent of the disability. That's not what they're arguing here at all. It's the complete opposite. The previous position was that there was no significant preexisting condition and that the claimant was actually back to work full time for several months and that he was not treating. That's my understanding of their position as of the plaintiff prior to the work accident. That's not what they're saying now. And, in fact, if that were true, then the preexisting condition should actually be irrelevant and it should be said to be zero and there should be no apportionment discussion whatsoever. So it's hard to reconcile these completely contrary positions that are now here before you compared to the arguments that were raised below. And I think in this case, unlike in the Fitzpatrick pattern, the defendant here has not ever waived its own waiver claim. We've asserted it in our brief when it became apparent that they were going to argue this brand new theory and we have not, in fact, waived our waiver claim. So we don't think that any type of apportionment argument should even be considered for the first time here on appeal. Nonetheless, without waiving our own waiver claim, we would submit that the Commission, in fact, did not even apportion the current disability to any preexisting condition. There is no specific evidence in the Commission decision that they performed any type of arithmetic apportionment operation in reaching their permanency award of 10% loss of the person. There's no evidence that the Commission felt that the current state of permanent disability regardless of whether it preexisted the accident or not, was at the 22.5% level which has been suggested. They never talked about that. There's just no evidence whatsoever of apportionment. The award of 10% loss of the person as a whole is really the full nature and extent of the claimant's permanent partial disability and that's what they intended. And that 10% amount, as indicated in some of your questions, was reached based upon a thorough review of the treatment, the diagnostic objective testing and the multiple opinions from Dr. Wehner, Dr. Fetter and Dr. Graf, all board-certified orthopedic surgeons. It would be illogical to conclude that the Commission, on the one hand, was crediting these opinions of Dr. Wehner and Dr. Graf and Dr. Fetter, all of whom uniformly questioned and minimized the claimant's current disability, only to then ignore those opinions and first say, well, this is a 22.5% case and now we're going to bring it down. No, that was never their intention and it was never expressed anywhere in their opinion. This case is also different than Fitz besides the waiver issue because in Fitz, the Commission found a temporary aggravation of a preexisting condition, yet they still awarded 22.5% loss of permanent partial disability. Now, it's clear under the law that you cannot have those two things. You cannot have a finding of only a temporary aggravation because that is inconsistent and contrary to then awarding permanent partial disability. So on its face, that decision was wrong and it needed to be remanded simply on that. Here, we don't have a finding of a temporary aggravation, but we have a specific finding in the language of the Commission of a permanent aggravation. They did not, this Commission did not commit the error that the Fitz Commission did, and in fact, we can say that they found in favor of the claimant and against the defendant on that issue, finding a permanent and not a temporary aggravation, and therefore entitling him to the full measure of his PPD, which is 10%. And this is the amount, of course, which the claimant previously agreed with was fair and representative. If they had found this to be a temporary aggravation, of course, as indicated, it would have been a zero permanency, and that's not what they found. In essence, the claimant won on this issue. The defendant would also submit that the award of medical and TTD benefits is also not erroneous as a matter of law and that the Commission did not apply the wrong legal standard. This seems to me to be an attempt to piggyback the TTD and the medical bill reduction onto the same type of reasoning that was articulated in the PPD apportionment argument. Again, this argument was never presented before and shouldn't be considered here in the appellate court for the first time. Now, the alleged lack of rationale for finding three different doctors persuasive, there's an alleged lack of rationale for the Commission finding that the three defendant doctors were persuasive and therefore the decision must have been exclusively based on the preexisting condition. Well, that's not accurate at all. The rationale is multifaceted. The fact that we have three separate board-certified orthopedic surgeons who are all consistent with each other, at different points in time there was an indication that the Wiener report was stale. Well, two years later it wasn't stale when Dr. Graf examined the claimant and basically had the same findings on examination and drew the same conclusions. And in between those two we had Dr. Fetter doing a peer review report, again, freshening up Dr. Wiener's opinions. All of these doctors were saying the claimant was at maximal medical improvement as of October 5 of 2009 and that any subsequent medical treatment was not reasonable or necessary. All three board-certified orthopedic surgeons were saying that the claimant was capable of full duty as of October 5, 2009. Their opinions went in unrebutted. I would also add that on I think it's page two of the Commission decision, a point was made regarding the underlying section titled preexisting condition, as though everything that followed after that represented the entirety of a big, long discussion based only on preexisting condition. However, if you actually read that, you'll see that at most the first three sentences are a discussion of preexisting condition and everything after that, the entire rest of the page is a discussion of all the other reasons and findings regarding why they based the decision on the way they did. The, you know, specifically the October 5, 2009 initial examination and opinion of Dr. Wiener, I mean, she did a full examination. Her diagnosis was low back pain. It was a resolved sprained strain. She did an examination and found it was normal except for findings of prior meningitis. She found non-anatomic leg complaints. She reviewed the MRI films, seeing mild degenerative changes. Based on that, she declared that she is at MMI and capable of full duty. Dr. Trotter agreed with that. Dr. Graff then two years later reached the same conclusion. All three of them discussed the pre and post-accident MRIs, which they considered to be essentially the same. And, therefore, what's important about that, I think, is that if the petitioner pre-accident was able to work full duty and not treat and was asymptomatic for a period of months, as alleged, with these same MRI findings, then these MRI findings are not of consequence in support of further disability or further treatment. They weren't then and they aren't now. The defendant also submits that the decision should be affirmed because it did contain sufficient findings that would permit the court to review the decision and that it should be affirmed. Again, this is an argument not raised below and it shouldn't be considered now for the first time on appeal. It seems to be, again, based on the same arguments as the lack of rationale for TTD and medical bill reduction. Again, we have Dr. Wehner's examination being completely normal, non-anatomic leg complaints, mild degenerative changes on an MRI. No objective support, the commission pointed out, from any of the three reviewing physicians for continuing lumbar complaints. None of them found any abnormalities present in the MRI to justify additional treatment or disability. It seems that the plaintiff is kind of setting an unreasonable standard here and saying, well, they did not produce essentially a perfect decision or sufficient findings, and they're setting an unreasonable standard regarding what that rationale and how well it should be explained, when here we have a plaintiff that had the opportunity but did not avail itself to cross-examine these doctors over their reports and their opinions and perhaps help the commission, help it develop reasons why it should not find these opinions credible or should find them not credible. All it had to work with were the actual reports. So it's not a summary adoption of a preexisting condition paradigm. It contains an abundance of findings, which would permit the appellate court to review the decision and it should be affirmed, which leads us to the manifest weight argument. Again, I think it's kind of a hybrid here, but we've touched upon so many of the things. There are instances where the claimant did lack credibility, and I know the commission decision did not specifically highlight those, but if you want to review this for manifest weight of the evidence, I invite you to look at some of these things. The claimant testified that he could not have complained to Dr. Graf of left-sided pain, since he has paralysis on the left side of his body and he has no sensation and he feels nothing on the left side of his body. That was his trial testimony. Yet the medical records show that on the date of the accident, July 11, 2009, he had left shoulder pain, left elbow pain, left hand pain. That sounds to me like somebody that can feel left-sided pain. He also at trial testified that his only prior low-back treatment and low-back complaints were from an auto accident December 30, 2008, and that he only missed a week from work as a result of that. But the records that were introduced in evidence show that he had significant back problems going back to 2007, prior to the car accident, and that he missed probably in the neighborhood of eight weeks rather than one week, which he testified to. So we have, we also have the, again, the two pre-accident lumbar MRIs, which are very similar, if not the same finding as the post-accident MRI. So again, if we have an individual who's not treating and he's able to work full duty with those kinds of MRI findings before the accident, how can they possibly provide support for disability and further medical treatment after the accident? What the commission has relied upon is three board-certified orthopedic surgeons. The two that actually examined the claimant both made note of residual deficits from childhood meningitis. They all opined he'd reached MMI and was capable of full duty October 5, 2009. This needs to be compared to Dr. Montella. He labeled the claimant as permanently and totally disabled based on essentially an MRI showing a preexisting bulging disc. It's not evident at all that he was aware of any of the prior treatment or any of the prior MRI studies. He undertook an outpatient discogram and decompression procedure, which essentially the charges were $50,000, which on its face is suspicious. In support of the off-duty or the TTE, on the one hand, we only have sporadic off-work or light-duty authorizations from chiropractic practitioners or Dr. Montella. Dr. Montella had performed a series of unsuccessful injections and then his $50,000 decompression discogram, which didn't have any effect. It didn't help the petitioner. The petitioner testified that. So if one of the tests is did the treatment provide relief and therefore it was reasonable and necessary, in this instance, we have the petitioner's testimony that no, no, it didn't. Counsel, your time is up. Thank you. Counsel, you may respond or reply. Just quickly, I wanted to reference, counsel pointed out that in my brief at the circuit court level, we conceded that the 10% loss of use of man as a whole was not against the manifest weight of the evidence, and we maintain that position. In the manifest weight, under that, from that perspective, the 10% loss of use of man as a whole was not against the manifest weight of the evidence. It's not against the manifest weight. We're willing to acknowledge that. What we're saying is that the award, the basis for the award, was erroneous as a matter of law. It states in the paragraph in which they're awarding, and I'm not going to read this to this court, but it states that that's the reason for the reduction. And it was also mentioned that since we did not bring this argument up, the standard review argument up at the circuit court level, that that's been waived or there's some type of forfeiture. Again, as I stated in my brief, I don't think, I think that this court is able to review the, or is charged with reviewing the entire record and is not limited by what I say you're limited to when I argue to the circuit court. Well, does that allow you to take different positions? I'm not suggesting that you have. I'm just throwing out hypothetically, the record is the record, but in terms of arguments made, positions taken, those can vary. And are you saying you're not bound by positions that you've taken in the lower court? I think it is, since this court is reviewing the entire record, I think everything must be reviewed. All legal arguments must be reviewed, especially when you're talking about an error as a matter of law. I think that, I don't think that my prior arguments with respect to manifest weight of the evidence was inconsistent, necessarily, with my argument, or our argument regarding the application of the wrong legal standard. I think that... But does inconsistency mean it hasn't been waived? The fact that they're not inconsistent, does that mean it hasn't been waived? I don't believe it has been waived. Just because of the consistency, that in and of itself... So as long as your argument before us is consistent with some argument that you made below, you haven't waived this new argument? No, no, Justice Hoffman, I don't believe that. I think the question was, if the arguments run counter to each other, is that something you can do? Can you have two conflicting arguments? And what I'm stating is that here, I happen to not have two conflicting arguments. I don't think you're a prone accuser of having a conflicting argument. You're an accuser of having not raised the argument before you got to us. That was his argument for suggesting that you couldn't argue it. You hadn't raised it before. It's a standard of review argument, and I think that given your ability to review the entire record, I think that that is a standard. The standard of review is obviously something that can be brought up before you the first time. And counsel mentioned with respect to the apportionment portion of the decision, that since there was no direct allocation, 10 percent for the prior or 10 percent for the current condition and 12 and a half for the prior, that this isn't apportionment. And the Fitz case is the one that calls it apportionment. I don't know what to call it, but what I know is what they did in this case is exactly what they did in Fitz. And in Fitz, the Supreme Court determined that that was erroneous as a matter of law. I think the cases are identical. I don't think it can be ignored, like I said before, that the existence of a preexisting condition is in that paragraph. I mean, I think that that's pretty convincing that that's what they were relying on. Quickly, with respect to Julie Wiener, as I said earlier, the fact that Julie Wiener's, the reason I state that Julie Wiener's opinions were stale by the time we tried the case is because two doctors reiterated exactly what she said didn't somehow revive her opinions and make them current. They were still identical to what she said in October of 2009. That October 5, 2009 was a significant date, a date of MMI, and those two subsequent doctors agreed with it. They added nothing new. Their physical findings were almost identical. Everything was identical. Counsel mentioned that two MRIs were identical, and I would submit, and I mentioned in our brief, that this case goes beyond the MMI. It is about the condition that caused disability from October 5 and thereon, the temporary total disability that it caused up until the petitioner reached MMI. It's not about the MRI findings, although, as I mentioned, there is a positive EMG. There was a positive discogram. And lastly, again, the meningitis was brought up again, and I just want to remind you that the meningitis, the symptoms regarding the meningitis didn't magically appear on October 6, 2009. They were there. The petitioner wasn't treating for it. He was working full duty prior to this accident. They didn't show up the day after a petitioner was declared at MMI by Julie Wiener. For those reasons, we would respectfully request that the arbitrator's decision be received. Thank you. Thank you, counsel, both, for your arguments. This matter will be taken under advisement and written disposition shall issue.